**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JOANNA ROBINSON,**

      **Plaintiff,**

**vs.**                              **Case No.: 5:11cv320-CAS**

**MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,**

      **Defendant.**

_____/

**MEMORANDUM OPINION**

      This is a Social Security case referred to me upon consent of the parties and reference by District Chief Judge M. Casey Rodgers.  Docs. 7 & 14.  After careful consideration of the entire Record, the Decision of the Commissioner should be affirmed.

**I.  Procedural History**

      On July 21, 2009, Plaintiff filed an application for supplemental security income (SSI), alleging her disability beginning August 6, 2008.  R. 16.[1]  (During the administrative hearing, Plaintiff amended her alleged onset of disability to July 21, 2009, the date of her application. R. 16, 19, 43-44.)  The claim was denied initially on October 13, 2009, and upon reconsideration on April 2, 2010.  R. 16, 82-83. Thereafter, on April

_____

      [1]   All references to the Record shall be by the symbol R. followed by page reference appearing on the lower right-hand corner of each page of the Record.

29, 2010, Plaintiff filed a written request for hearing before an Administrative Law Judge (ALJ).  On November 18, 2010, Plaintiff appeared and testified at an administrative hearing, in Panama City, Florida, and was represented by David E. Evans, an attorney. Robert N. Strader, a vocational expert (VE), also testified during the hearing.  R. 43, 73-80, 127 (Resume).

On January 6, 2011, Plaintiff's counsel submitted a written closing argument. R. 130-31.  Counsel refers to diagnosis and treatment notes from Drs. Bone and Morrow and concludes by stating: "The claimant has significant depression and anxiety as a result of her physical problems such, contends that she is not capable of consistent work activity."  *Id.* at 131.

On March 23, 2011, the ALJ entered his Decision and found Plaintiff not disabled under the Social Security Act (Act).  R. 16-23.  On April 29, 2011, the Appeals Council denied Plaintiff's request for review.  R. 7-9.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this Court.  20 C.F.R. § 416.1481.  This appeal followed.  R. 11.  The parties filed memoranda of law, docs. 12 & 16, which have been considered along with the entire Record.

## II.  Findings of the ALJ

In his written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1.  Plaintiff was born on September 19, 1965, and was 45 years old as of the hearing date.  Plaintiff has at least a high school education (completed the 10th grade and obtained a GED) and is able to communicate in English. R. 19, 22.

2.  Plaintiff has not engaged in substantial gainful activity since July 21, 2009. R. 18.

3. Plaintiff has several "severe impairments: endometrial adenocarcinoma stage I, human immunodeficiency virus (HIV), status post hysterectomy, status post radiation therapy."  R. 18.

4. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  R.18.

5. Plaintiff has the residual functional capacity (RFC) "to perform the full range of light work as defined in 20 CFR 416.967(b)"; "can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently"; "can sit, stand, and/or walk up to 6 hours in an 8-hour workday"; with "[u]nlimited pushing and pulling" and without "postural limitations" and "no mental restrictions."  R. 18.

6. Plaintiff is unable to perform any past relevant work.  R. 22.

7. Transferability of jobs is not material to the determination of disability.  R. 22.

8. Considering Plaintiff's "age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform," such as ticket taker (light), file clerk (light), housekeeper (light), order clerk (sedentary), and cashier (sedentary).  R. 22.

9. Plaintiff has not been under a disability since July 21, 2009, the date the application was filed.  R. 23.

## III.  Standard of Review

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991)  ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or

derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 416.920(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 416.912. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Relevant Medical History

## A.  Testimony from the Evidentiary Hearing

### Joanna Robinson (Plaintiff)

Plaintiff is 45 years old and resides in Panama City, Florida.  R. 46-47.  She completed the 10th grade, but received a GED at age 40.  She wanted "to prove to [her] mom that [she] could do it."  R. 47-48, 163.

Plaintiff is 5'3" tall and weighs 192 pounds, having lost approximately 70 pounds since 2004, of which approximately 30 pounds were lost in the past year because she was "sick and not being able to eat like [she is] supposed to."  R. 49, 157.

Plaintiff last worked in 2004 for five months at the Goodwill store as a cashier. She spent a majority of the time working on the floor and would put clothes on the shelves and would "hang them" but "nothing else."  R. 49-51.  At the time, Plaintiff reported she was taking medication for her HIV that was making her "real sick" and she could work.  She was getting weak and would run to the bathroom vomiting "[a]bout five or six times because the medication was making [her] real sick."  R. 49-50. Her medication has been changed, but she continues to have these episodes (nausea and vomiting) about four times a day.  R. 50.

Prior to her employment at Goodwill, she worked for maybe a month part-time as a cashier at Save-A-Lot, a grocery store.  R. 51; *see also* R. 150-53 (summary of prior work).  Prior to this work, Plaintiff worked for 12 years at Dairy Queen as her first job when she was 16 years old.  She cooked, acted as a cashier, and served people.  R. 52-53.  In 2001, she was self-employed working at the farmer's market in Birmingham,

Alabama, for not quite a year.  She bought produce and then resold the produce.  She earned approximately $1,000 a month or approximately $10,000 in this produce sales job.  R. 54-56.  The heaviest weight she lifted was a crate of tomatoes, but if it was more than one box, she needed a dolly.  R. 74; *see also* R. 198 (reference to lifting less than ten pounds and produce of five pounds).  (Without knowing the precise weight of the crate, Mr. Strader guessed that the weight equated to "light to medium."  R. 74.)

Plaintiff does not think she can work now on a full-time basis.  She cannot "do a lot of lifting like [she] used to [do] at Dairy Queen."  R. 56-57.  She may be able to lift "a half a gallon of milk because [she does not] pick up nothing heavy."  R. 57.  Someone usually accompanies her when she buys groceries in order to lift the products, otherwise she drops the items because she loses feeling in her arms (mainly her left arm) and is "too weak to try to pick up anything."  R. 57.  Her "first three fingers on [her] left [arm] go numb real bad.  [Her] right hand is mobile . . . but [she] can't do a lot of lifting because [she will] lose it too because [she has] had pins in [her right] wrist and it's like arthritis is trying to get back in [her] writs [sic]."  R. 57-58.  She could write a letter, but she would have to stop because she gets cramps in her wrist.  She does not know why the cramps or tingling occur, although her doctors (Drs. Bone, Morrow (OB-GYN/surgeon, R. 73, 348, 480), and Murshed (oncologist, R. 73, 413-14)) are running tests.  R. 58-59.

Plaintiff has weakness and fatigue, which was not very common for her.  She has "always been energetic, but [she has] done nothing but sleep."  R. 59.  Her fatigue is

getting worse.  And she sleeps "the majority of the day."  She falls asleep "about four or five times a day."  R. 59.  She has "restless" sleep at night.  R. 60.[2]

Plaintiff has spasms in her back often four times a day and sometimes longer. They start in the middle of her back and proceed downward, which makes her legs go numb.  She believes this is why she has to stand up and move about.  R. 79.  In a July 24, 2009, supplemental pain questionnaire, Plaintiff reported experiencing a very sharp pain in her lower back to her legs every day.  At the time, Plaintiff was not taking any prescription drugs, only non-prescription medicines such as Advil.  Plaintiff experienced "upset stomach and heart burn" as side effects from the pain medications.  R. 182-83; *see also* R. 185-92 (Plaintiff's July 24, 2009, adult function report).

She reiterated that she goes to the bathroom about six times a day because of nausea and sometimes has diarrhea about three times a day.  The bathroom sessions last between 30 and 45 minutes.  R. 60-61.

Plaintiff suffers with headaches everyday that last "[a]bout four to six hours." R. 61.  She is also diabetic, with her average blood sugar level at 263, and her levels are higher in the evening.  She takes two different insulin pills daily.  She also has "blurred vision" when her blood sugar is elevated.  R. 62.  When her blood sugar level is

---

[2]  In a field disability report dated July 21, 2009, and after a face-to-face interview with Plaintiff, it was reported that Plaintiff had no difficulty in sitting, standing, or walking among the categories listed.  R. 168.  It was also observed, in part, that Plaintiff "appeared very fatigued" and that she and her husband were having financial difficulties.  *Id.*  "She was polite, clean, and did not understand how she is not approved and her husband is."  *Id.*

high, she is very fatigued and tired and cannot remain motivated.  R. 63-64.  She has

trouble eating and is changing her diet because of her diabetes.  R. 64.

Dr. Murshed is her cancer (oncologist) specialist and she saw him the day before

the hearing.  It appears that she went to Pensacola and Dr. Ramos noticed a tear in her

vagina that was causing her severe pain, especially when urinating, and that also

affects her throughout the day.  (Dr. Ramos referred her to Dr. Murshed.)  R. 65.

Plaintiff wears "a panty liner" and started wearing them in April 2010, the time of her last

radiation.  R. 66, 71.

Plaintiff described her prior cancer that was "on the outskirts of [her] womb."

R. 66.  She was told that it may reoccur.  R. 66.

She also said she cannot "do much lifting" and is uncomfortable sitting for a long

period of time.  She does a lot of standing.  She can sit comfortably for maybe one hour

at one time.  She cannot walk the length of a football field.  R. 67.  She also cannot

stand in one spot--she has to move.  R. 67-68.

Plaintiff reports having depression everyday, which affects her "social life" and

the way she reacts toward people.  She has crying spells "[a]ll the time, all day."  She

does not have anxiety attacks.  When she has depressive episodes, she wants to stay

in her room and remain alone.  R. 68.

She takes approximately 10 pills, twice a day.  She believes the pills curb her

appetite and make her irritable.  R. 69.  Dr. Bone prescribes a few pills.  Drs. Morrow

and Murshed also prescribed some pills.  R. 72-73; *see also* R. 236 (list of medications).

Plaintiff lives with her husband who does a majority of the household chores. They do not socialize much except to briefly visit her niece.  She does not shop alone. R. 70.  She has a nurse (Ms. Pam from Pensacola) that comes to her house once a month and "checks on [her]."  She checks her blood pressure, sugar levels, and weight. R. 74.  Her niece "does the heavy work in [her] house."  Ms. Pam does not give medications to Plaintiff.  R. 74-75.

She drove her automobile the day of the hearing for the first time in a year. However, she does not like to drive, in part, because she is concerned with driving while taking medication. R. 70-71.[3]

### Robert N. Strader (vocational expert (VE))

Mr. Schrader is a vocational consultant.  He reviewed the file and heard Plaintiff's testimony.  He has not discussed the case with anyone.  R. 73.

Mr. Strader described Plaintiff's prior work history: produce and vegetable vendor, described as medium, semi-skilled work at DOT skill level 3, which she performed to a light to medium work-DOT # 291457018.  R. 75, 238.

The ALJ asked Mr. Strader the following hypothetical question:

Q: Let's assume that we have an individual who is now 45 years of age, has completed the 10th grade, and has a GED, and let's assume a good ability to

---

[3]  In his Decision and after summarizing Plaintiff's testimony, the ALJ states:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment  R. 19.

read, write, and use numbers; let's assume the past work history you just described and shown [exhibit] B16E [R. 238] and let's assume the following restrictions: we would use the restrictions from Exhibit B12F and B13F – sorry B12F [R. 432-39]. . . .

A: Which are physical restrictions.

R. 76. [4]

The ALJ further asked Mr. Strader to

assume the individual can occasionally left 20 pounds, frequently lift 10 pounds; stand for a period -- this person can stand six hours, walk six hours, and sit six hours in an eight-hour day with normal break; unlimited pushing and pulling; no postural limitations.  Those are the primary restrictions from a physical standpoint.   From a mental standpoint, [exhibit] B13F [R. 440-53] shows non-severe so no mental restrictions.  So if those restrictions that I just gave you, would there be any jobs in the regional or national economy that such a person could perform?

R. 76-77. [5]

In response to this hypothetical, Mr. Strader opined that such a person could

perform a light range of employment, with no past relevant work.  R. 77.  He felt

comfortable that such a person could perform several job categories such as ticket

taker, file clerk, and housekeeper, which have a light exertional level, (R. 23, 77), and

two sedentary jobs such as order clerk and cashier.  This is a representative list.  R. 78.

---

[4] Exhibit B12F is a Physical Residual Functional Capacity Assessment dated March 18, 2010, and was performed by Clarence Louis, M.D., a non-treating, medical consultant.  R. 439.  The ALJ assumed that this assessment was done in March 2009.  R. 76; *see also* R. 20-21 (ALJ's reference to this assessment).

[5] Exhibit B13F is a Psychiatric Review Technique dated March 30, 2010, and was performed by Judith E. Meyers, Psy. D., a non-treating, psychological consultant.  R. 440; *see also* R. 20-21 (ALJ's reference to this assessment).

The ALJ asked Plaintiff's counsel if there were any restrictions in the file and he responded that he did not see any work-related limitations.  R. 78.

In response to questions posed by Plaintiff's counsel, Mr. Strader explained that normally a person at work is allowed one 15-minute break in the morning and in the afternoon.  More frequent breaks, [e.g., "urination or whatever," R. 79] "[o]n an occasional basis would be okay, but if it was excessive, it would not be tolerated."  R. 79.  Employers would "[n]ot normally" accommodate more breaks if they occurred on a daily basis.  R. 79-80.

## B.  Treatment Prior to and After the Date Plaintiff Alleges Disability

Medical and other evidence presented to the ALJ is set forth in the ALJ's Decision at pages 19 through page 21 in conjunction with his analysis of the five-step sequential process.  R. 19-21.

Plaintiff disagrees with the weight given to the evidence and the conclusions reached by the ALJ regarding the issues raised herein.  Doc. 12.  Plaintiff does not disagree with the factual findings derived from the medical and other evidence submitted to the ALJ during the evidentiary hearing, although Plaintiff argues that "the ALJ did not make a finding nor give an "indication that Mrs. Robinson's claims about her side effects were not credible or that the claimed side effects of the medications were not plausible," *id.* at 6, 8, and further that "the ALJ did not address Mrs. Robinson's statements regarding her frequent need to go to the bathroom 5 or 6 times a day for 30 to 45 minutes at a time due to vomiting and diarrhea cause[d] by side effects from her medications" and no credibility finding regarding these issues.  *Id.* at 8.

Nevertheless, the ALJ states that he considered the entire record in order to determine the extent of Plaintiff's RFC.  R. 18.  The ALJ's basic findings from the record are reported in his Decision, beginning toward the middle of page 19 with a summary of Plaintiff's hearing testimony, and through the top portion of page 21 of his Decision and are incorporated herein.

> At hearing, the claimant, by and through counsel, amended her alleged onset date to July 21, 2009.  The claimant is a 45-year-old woman who completed the 10 grade and obtained a GED.  The claimant previously worked in 2004 at the Goodwill as a cashier. She was fired because she was not able to maintain her position, as she was always sick and unable to work consistently.  Her medications did not interact well with her as she was constantly vomiting.  The claimant also worked for Dairy Queen as a server and cashier. In 2001, she was self-employed and worked at a Farmers Market in Alabama selling produce.

> The claimant states that she cannot work because she has difficulty with lifting things.  She says she can only lift ½ gallon of milk.  She loses feeling in her arm and hands, more particularly on the left side.  She also has low energy levels. For the most part, she wants to sleep a lot during the day. At least four to five times, she takes it nap.  She goes to the bathroom at least six times per day because of nausea and diarrhea. She suffers with headaches and has poor vision.  She says that she is diabetic and is currently on two different types of insulin.  She has problems eating and is very selective in her food choices. In terms of her limitations, the claimant states that she cannot sit or stand for long periods.  She also alleges that she suffers with depression and has frequent crying spells. . . .[6]

> A review of the objective medical evidence indicated that the claimant suffered with severe [sic] months of abnormal vaginal bleeding.  She established care with William D. Bone, M.D., at Panama City Infectious Disease in 2008.  The claimant was diagnosed with HIV with lab work indicating CD4 levels of 1003 and a viral load of less than 48 on June 5, 2008.  Her physical examinations were normal. She had no fever or chills, and neurologically the findings were normal.  (Exhibit

---

6   At this point, the ALJ finds that Plaintiff's medically determinable impairments could reasonably be expected to cause her allege symptom.  However, the ALJ finds Plaintiff's *"statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with"* his RFC assessment.  R. 19.  (emphasis added).

B3F). By July 15, 2009, the claimant returned to see Dr. Bone for medication management and follow-up. Her viral load was 8,780 and CD4 levels were 858. Physical examinations were normal. (Exhibit B3F).

The claimant had a subsequent follow-up appointment with Dr. Bone on September 2, 2009. Her CD4 count dropped to 802, but her viral load increased to 11, 400. Physical examination indicated that her thyroid palpated normally, she was normal from a respiratory standpoint, and all extremities were normal. Overall, the physical examination was benign. (Exhibit B3F).

An initial State Agency mental assessment indicated that the claimant did not suffer from a severe mental impairment. The medical consultant opined that the claimant had only mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace. (Exhibit B4F). An initial State Agency physical assessment was conducted, finding the claimant capable of a full range of light work. (Exhibit B5F).

The claimant started treatment with Coastal OB/GYN, P.A., on November 4, 2009. The claimant presented with menstrual irregularity, indicating that she had been bleeding since June. A physical examination was conducted, without noting any abnormal findings. A Pap Smear pathology study was completed. The results were described as malignant. There was a well-differentiated adenocarcinoma of the uterine corspus on background of Atypical EM hyperplasia. The claimant's HIV was classified as asymptomatic. (Exhibit B7F/B9F).

The claimant underwent a hysteroscopy, D & C, and hydro ablation on December 1, 2009, with hysteroscopy, D&C on December 1, 2009 with pathology confirming a well-differentiated endometrial adenocarcinoma in a background of complex atypical hyperplasia. She then on January 11, 2010, underwent a vaginal hysterectomy. The pathology specimen revealed well differentiated endometrial adenocarcinoma. The tumor did not invade the cervix. The tumor was noted as grade 1. The claimant was recommended for whole pelvic radiation treatment. (Exhibit B11F).

A subsequent State Agency physical assessment was completed, finding the claimant capable of light work. (Exhibit B12F). A later State Agency mental assessment was also completed, finding that the claimant did not suffer from a severe mental impairment. The consultant did not find any mental limitations. (Exhibit B13F).

On February 5, 2010, Dr. Bone provided a medical source statement. Dr. Bone reported that the claimant's current CD4 count is 841 with a viral load of 19,100

as of January 4, 2010.  Only the claimant's Geno-Urinary system was deemed as a serious impairment.  All other systems, including her musculoskeletal, neurological, cardiovascular, respiratory, and vision and hearing were deemed normal.  Despite this, Dr. Bone gave the claimant a poor prognosis and felt that the claimant would have restriction in activities of daily living and social functioning.  (Exhibit B10F).

The claimant returned to see Dr. Bone on March 30, 2010, for a follow-up and medication management.  The claimant's viral load was 19,100 and CD4 levels were 841.  The claimant resumed her HAART treatment and was taking atripla.  Physical examination revealed that the claimant had normal breath sounds.  The claimant's [sic] had full range of motion, and her lower and upper extremities were normal.  No ischemic changes were noted.  She was intact neurologically.

The claimant had another follow-up visit with Dr. Bone on August 2, 2010.  Recent testing indicated her viral load was 15,000 and CD4 count was 841.  The claimant attained diabetes mellitus type II, with a fasting glucose of 312.  (Exhibit B4F).

In the next two paragraphs, the ALJ reviewed and restated several of Dr. Bone's treatment notes and several diagnostic findings.  R. 21.  The ALJ gave his reasons for rejecting Dr. Bone's medical opinion and concluded: "These diagnostic findings coupled with Dr. Bone's benign physical examinations do not explain or substantiate the doctor's claim that the claimant would have any limitations in activities of daily living or in concentration, persistence, or pace."  *Id.*

The ALJ also relied on the RFC conclusions reached by the physicians employed by the State Disability Determination Services, which "supported a finding of 'not disabled.'"  R. 21.  Thereafter, the ALJ found that Plaintiff is unable to perform past relevant work as a vendor (produce and vegetables) and then determined, based on Plaintiff's age, education, work experience, and RFC, as well as Mr. Strader's

testimony, that Plaintiff can perform several jobs in the national economy, including work as a ticket-taker, file clerk, housekeeper, order clerk, and cashier.  R. 22-23.

Ultimately, the ALJ concluded that Plaintiff has not been under a disability since June 21, 2009.  R. 23.

## V.  Legal Analysis

### A.

Under points one and two in her memorandum, Plaintiff argues that the ALJ erred in considering the credibility of Plaintiff's complaints in assessing her RFC and second that the ALJ erred in finding that Plaintiff could perform other work in the national economy.  In particular, Plaintiff argues that the ALJ erred because he did not take into account (when determining whether she can work) that Plaintiff has suffered adverse affects, such as nausea and diarrhea, from her medications, which have caused her to go to the bathroom five or six times a day and between 30 and 45 minutes at a time and, as a result, she would not be able to work full-time.  Doc. 12 at 5-9.

In support of this argument, aside from citing to a list of her medications appearing in the record, R. 236, doc. 12 at 3, Plaintiff relies on her testimony regarding the number of pills she is taking on a regular basis and her descriptions of the resulting adverse effects.  The same can be said for the number of daily bathroom episodes and the potential impact on her ability to work.  *See* doc. 12 at 3-5.

Based on Plaintiff's testimony, the ALJ stated that Plaintiff was "fired [at Goodwill in 2004] because she was not able to maintain her position, as she was always sick and

unable to work consistently.  Her medications did not interact well with her as she was

constantly vomiting."  R. 19.  The ALJ stated that Plaintiff "goes to the bathroom at least

six times per day because of nausea and diarrhea."  She suffers with headaches and

has poor vision.  *Id.*  During the hearing, Plaintiff was questioned regarding her wearing

of "a panty liner," which she started wearing in April 2010, the time of her last radiation.

R. 66, 71.  The ALJ also noted that Plaintiff has problems eating and "is currently on two

different types of insulin."  R. 19.  The ALJ was also aware that Plaintiff "cannot sit or

stand for long periods" and that she "suffers with depression and has frequent crying

spells," *id.,* and that she experiences spasms.  R. 21.

        During the hearing, the ALJ asked Mr. Strader a hypothetical question that

included the factors the ALJ believed to be relevant.  R. 76-77.  *See* pp.10-12, *supra*.

In response to the hypothetical, Mr. Strader opined that such a person could perform a

light range of employment, with no past relevant work.  R. 77.  He felt comfortable that

such a person could perform several jobs such as ticket-taker, file clerk, and

housekeeper, which require a light exertional level, R. 23, 77, and two sedentary jobs

such as order clerk and cashier.  This is a representative list.  R. 78.  The ALJ asked

Plaintiff's counsel if there were any restrictions in the file and he responded that he did

not see any work-related limitations.  R. 78.

        In response to questions posed by Plaintiff's counsel, Mr. Strader explained that

normally a person at work is allowed one 15-minute break in the morning and in the

afternoon.  He also explained that it would be okay if there more frequent breaks, such

as "urination or whatever," R. 79] "[o]n an occasional basis," but if it was excessive, it

would not be tolerated."  R. 79.  Employers would "[n]ot normally" accommodate more breaks if they occurred on a daily basis.  R. 79-80.

The ALJ found Plaintiff to be "fairly credible and acknowledges that [Plaintiff] has had some residual pain following her hysterectomy and radiation therapy, but not to the extent to render her too incapacitated to work."  R. 21.

There is more than an inference in this Record that the ALJ considered Plaintiff's claims, but found them wanting because they were not credible as they were not supported by the medical and other evidence in the Record.  A brief review of the medical evidence supports this conclusion.

Plaintiff first established care with Dr. Bone on February 11, 2008.  R. 307-08.  At that time, Plaintiff had been HIV-positive for three years.  *Id*.  Plaintiff had "[n]ormal bowel sounds," "no muscle pain or weakness," denied "any opportunistic infections," "any extremities complaints," and denied "any genito-urinary complaints, such as hematuria, dysuria, frequency, urgency, hesitancy, nocturia, incontinence, etc."  *Id*. Among other diagnoses, Dr. Bone diagnosed (impression) Plaintiff with HIV disease, depression, hypertriglycerides, gastroesophageal reflux disease, and irregular menstrual cycle.  *Id.* at 308.  Similar impressions/diagnoses were made in subsequent visits from March 4, 2008, through December 22, 2009, R. 281-307, 371-77, but a weight gain began to be noticed on April 17, 2009, and thereafter.  *See*, *e.g.*, R. 290, 291, 294.  On July 8, 2009, Plaintiff was diagnosed with migraines and prescribed medication.  R. 288.  Other impressions and diagnoses are added thereafter such as "DUB."  R. 286.

In July 2009, Plaintiff was seen in the emergency room at Bay Medical Center, with intermittent vaginal bleeding for the past four months.  R. 279.  A clinical impression was circled as "vaginal bleeding" and "dysfunctional uterine bleeding." *Id.* at 278.  (On February 13, 2009, Dr. Bone noted that Plaintiff had a miscarriage, R. 295, and also noted from May 13, 2009, and thereafter that Plaintiff had continued bleeding.  R. 281-88, 291.)

In October 2009, State agency physician Robert F. Schilling, Ph.D., P.A., completed a "psychiatric review technique" and opined that Plaintiff had a mild impairment in her activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation. R. 330; *see also* R. 450 (opinion of Judith E. Meyers, Psy.D, of March 30, 2010, who reported Plaintiff had no functional limitations in these areas).  These opinions were confirmed in part by function reports completed by Plaintiff and her husband, which showed she could perform housework, shop for groceries, and take care of her personal needs without a problem.  *See, e.g.*, R. 174, 176, 183, 186-88; *see also* R. 339 (October 13, 2009, RFC assessment by Patricia A. Sanders, reporting Plaintiff's symptoms of being tired and napping two to three hours daily, but being able to "do her personal care, make up beds, clean house, vacuum" and laundry without problems). *See generally* Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005).

On November 4, 2009, Plaintiff started examinations and treatment with Gregory K. Morrow, M.D., with Coastal OB/GYN.  Clinical notes report Plaintiff "bleeding since

June." R. 344-47, 360-61. Plaintiff was seen by Dr. Morrow two years ago with the same problem. Vaginal bleeding was noted. R. 346.

On December 1, 2009, Plaintiff underwent a laparoscopic bilateral tubal ligation, hysteroscopy, hydrothrombo-ablation, and D & C. R. 348-49, 388.

On December 9, 2009, Plaintiff saw Dr. Morrow. Lab results were described as malignant. R. 357, 383. On January 5, 2010, Plaintiff met with Dr. Morrow for a pre-op/surgery consultation for a hysterectomy. R. 381.

Plaintiff followed-up with Dr. Morrow on January 29, 2010, after her hysterectomy on January 11, 2010, and was reported as "recovering well." R. 379, 479. Dr. Morrow's pre and post operative diagnosis was: "Grade I adenocarcinoma uterine corpus." R. 477, 480.

On February 8, 2010, Plaintiff met with Hasan Murshed, M.D., with the Department of Radiation Oncology. R. 413-14.[7] Dr. Murshed's notes refer to Plaintiff with "a recent diagnosis of endometrial adenocarcinoma FIGO Ic, grade 1." *Id.* Dr. Murshed also refers to the pathology specimen and, in part, states: "tumor noted as grade 1." R. 413. Plaintiff denied "any shortness of breath, chest pain, nausea, vomiting, extremity weakness or any headaches." *Id.* Radiation treatment was recommended. *Id.* at 414. (The ALJ identified one of Plaintiff's severe impairments as

---

[7] It appears that Plaintiff had her first radiation on February 15, 2010. Plaintiff reported "some abdominal tenderness at site of recent surgery and some fatigue from radiation. No other problems. Denies any complications since starting radiation." R. 215. Plaintiff also reported "no mental impairment that interferes with function. . . .[Plaintiff] reports only obstacle to working is the HIV and current Dx of CA for which she started tx." R. 215.

"endometrial adenocarcinoma stage I."  R. 18.  *Compare with* Dr. Bone's February 5, 2010, reference to Plaintiff's cancer as "cervical cancer, stage II+."  R. 398.)

A December 22, 2009, note from Dr. Bone indicates that Plaintiff complained of recent surgery (on December 1, 2009) and discovery of uterine cancer and that she is scheduled for a hysterectomy for after the first of the year.  No changes are reported in Dr. Bone's review of, e.g., Plaintiff's genitourinary system.  R. 371; *see also* R. 461-63, 469-72 (Dr. Bone's examination reports of February 2, 2010, March 30, 2010, June 15, 2010, and July 2010).

On February 2, 2010, Dr. Bone's notes do not indicate any complaint of diarrhea or problems with urination.  R. 471-72.

On February 5, 2010, Dr. Bone completed a "physician referral and request for level of care determination."  R. 397-98.  All body systems were reviewed and found to be normal, except the geno-urinary system that was deemed a serious impairment. R. 397.  Dr. Bone gave Plaintiff a poor prognosis and poor rehabilitation potential and felt that Plaintiff would have a restriction in activities of daily living and social functioning (based on repeated manifestations of HIV infection).  Dr. Bone also placed an "X" next to "cervical cancer, stage II+" and wrote "uterine cancer" under the heading "malignant neoplasms."  R. 397-98.

In March 2010, State agency physician and medical consultant, Clarence Louis, M.D., completed a RFC assessment and noted that Plaintiff's gastrointestinal system was normal and that she had positive bowel sounds.  R. 433-34.  Dr. Louis opined that Plaintiff could perform light work because her complaints were only partially credible.

R. 433-34, 437.  *See* 20 C.F.R. § 416.927(f)(2)(i).

On May 26, 2010, Plaintiff returned to Dr. Morrow complaining of "night sweats but denied fever" and also presented "with pelvic pain."  "She thinks she is falling apart." Dr. Morrow did not note any current abnormality.  Dr. Morrow noted in part: "1/11/2010 for Stage 1C adenoCA endometrium with neg washing, nodes but >50% myometrial invasion."  R. 475-76.

On or about August 2, 2010, Dr. Bone notes that Plaintiff "has developed *diarrhea* on her new HAART regimen," followed by an impression/diagnosis of diarrhea. Bowel sounds are reported as active and normal.  Plaintiff reported denying any genito-urinary complaints as previously reported.  R. 459-60.  A similar complaint regarding having *diarrhea* is reported later in August 2010, without a similar impression/diagnosis, R. 457-58, but no report of *diarrhea* in September 2010, although it is noted Plaintiff "now has type II diabetes."  R. 455.

To the extent the ALJ rejected Dr. Bone's opinion of February 5, 2010, that Plaintiff had a poor prognosis, the ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating

physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d at 583, *citing* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

In this case, the ALJ did not err when he rejected Dr. Bone's February 5, 2010, opinion regarding Plaintiff's poor prognosis and poor rehabilitation potential such that it would restrict her activities of daily living and social functioning to the extent that she would be unable to work.  As noted by the ALJ, "the opinion is not supported by the treating notes, or by the objective medical evidence in the file."  R. 21.  *Compare* Williams v. Astrue, No: 8:08-CV-600-T-MAP, 2009 U.S. Dist. LEXIS 130298 (M.D. Fla. July 2, 2009) (denial of claim affirmed where plaintiff did not identify specific objective evidence corroborating her complaints of drowsiness and diarrhea in memorandum of law nor cite to any evidence documenting such complaints or identify a physician who heard such complaints) *with* Hayes v. Astrue, No. 8:08-CV-1779-T-MAP, 2009 U.S. Dist. LEXIS 127339 (M.D. Fla. Jan. 23, 2009) (denial of claim reversed where the medical record consistently notes Plaintiff's diarrhea and related problems).

Further, the ALJ considered the evidence, including Plaintiff's testimony, regarding her frequent bathroom use because of nausea and diarrhea, constantly vomiting from using medications, lack of energy and need to sleep a lot during the day, and other factors that Plaintiff deems disabling.  The ALJ found Plaintiff "fairly credible," but not to the extent that she is disabled and cannot perform any work in the national economy.  Substantial evidence supports the ALJ's credibility determination of Plaintiff. Substantial evidence also supports the ALJ's determination that Plaintiff can perform at least light to sedentary work in the national economy.

### B.

Plaintiff argues the ALJ erred in finding that Plaintiff's HIV and cancer severe impairments do not meet Listing 14.08E of the Commissioner's listing of disabling impairments at step three of the sequential evaluation process.  Doc. 12 at 9-11.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1.

Throughout his Decision, the ALJ discusses the medical and other evidence relating to Plaintiff's HIV and cancer.  However, he concluded that "[h]er impairments do not appear to be of disabling severity for the requisite 12-month period."  R. 21.  Plaintiff correctly states that according to Social Security Ruling 93-2p, the 12-month disability period is dispensed with if a claimant with an HIV infection as described in section 14.00D3 of the preface to the Immune System listings, has an impairment that meets or equals one of the listed criteria required in Listing 14.08.

Plaintiff refers to Listing 14.08E, which relates to malignant neoplasms.  It appears that Plaintiff is relying on Listing 14.08E1 that states "1.  Carcinoma of the

cervix, invasive, FIGO *stage II and beyond*," doc. 12 at 10, in light of her reference to Dr. Bone's comments made in his February 5, 2010, two-page "physician referral and request for level of care determination" report.  R. 397-98.

Dr. Bone is one of Plaintiff's main, ongoing treating physicians.  As noted above, Dr. Bone finds that Plaintiff has a severe impairment in her genito-urinary tract body system, uterine cancer, and "cervical cancer, *stage II+*."  He also noted that she had restrictions in daily living and in maintaining social functioning.  R. 397-98.

The ALJ referred to Dr. Bone's report in his Decision.  R. 20.  The ALJ also refers to exhibit B11F that includes a pathology report and Dr. Murshed's February 8, 2010, notes, which are consistent with Dr. Morrow's January 11, 2010, notes, including that Plaintiff's tumor was *grade 1*.  Based on his consideration of all the relevant medical evidence, the ALJ found that the "tumor was noted as grade 1," not grade 2 or stage 2 as noted by Dr. Bone.  R. 20.

Here, the ALJ considered the opinion of Dr. Bone and necessarily the opinions of Drs. Morrow and Murshed and adopted the opinions of the latter treating physicians when he found that Plaintiff's tumor was grade 1 and not grade 2.  R. 20.

The ALJ did not refer to a specific listing in his Decision.  *See* R. 18.  However, given his prior findings that Plaintiff has HIV and cancer, and the fact that Listing 14.08E1 refers to malignant neoplasms and carcinoma of the cervix, the ALJ implicitly determined that Plaintiff's impairments did not meet or equal Listing 14.08E1.  *See generally* Hutchinson v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).  *See also*

Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria").

Furthermore, Dr. Bone's opinion does not prove that Plaintiff's HIV and cancer otherwise meets Listing 14.08E1 or that Plaintiff is otherwise severely restricted in her daily activities because Dr. Bone's February 5, 2010, opinions are inconsistent with the medical evidence of record, including Dr. Bone's own notes.  *See generally* 20 C.F.R. § 416.927(d)(4).  For example, except as noted above, Dr. Bone's treatment notes do not indicate that Plaintiff is doing poorly.  R. 281-308, 371-77, 455-64.  Also, Dr. Bone noted that Plaintiff denied opportunistic infections, R. 281, 283, 285, 287, 291, 295, 297, 299, 301, 303, 305, 307, 371, 373-74, 376, 461, 463, 469, 471, despite her cervical cancer.  R. 461, 463, 469, 471.

The ALJ's determination that Plaintiff's impairments did not meet or equal a listing, implicitly here Listing 14.08E1, is supported by substantial evidence.

## VI.     Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the Record and the ALJ correctly followed the law.

Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on June 13, 2012.

**s/     Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**